Well, now your argument in our first case set for the calendar, which is 18-56256 Broidy Capital Management, LLC v. State of Qatar. Mr. Collins, you may proceed. Judge Collins, and may it please the Court, I'd like to reserve three minutes for rebuttal, please. This case raises an issue of great significance in our increasingly interconnected high-tech world. Whether a foreign state can be held to answer in the courts of the United States for a malicious hacking and media distribution campaign aimed at a U.S. citizen and his U.S.-based computers. Qatar argues, and the District Court agreed, that it gets the benefit of sovereign immunity because plaintiffs have alleged some illegal hacking episodes originating overseas. But Qatar's argument misconstrues the FSIA's non-commercial tort exception of 1605A5, and it misconstrues our allegations. In particular, Qatar seeks to apply a strained version of the entire tort rule that is inconsistent with this court's decisions, especially Olson v. Sheldon v. Mexico. There, the court held that a foreign country's conduct is not immune from suit under the non-commercial tort exception if at least one tortious act occurs in the United States. And here, the complaint and supporting materials allege numerous entire torts occurring in the United States under the Olson standard. We allege two categories of torts occurring in the United States. Hacking torts originating in Vermont, and torts involving the distribution to the U.S. media occurring in the U.S. Who do you allege are the persons who committed those entire torts within the United States? We allege that Qatar, through its agents, through its U.S. agents, committed those torts. And how are agents covered under the text of the statute? Because this tort exception differs from the other tort exceptions in the terrorism clauses in 1605A and B, which specifically add agents, and this one doesn't. How does agent fit into the text? Well, we allege Qatar's involvement in those torts, and this is under – A-5 has also been read to apply to agents as in – I mean, a perfect example is the Liu case. Liu is a case that involved liability against Taiwan solely because A, the head of their intelligence agency operating abroad was involved in conspiring, and B, he sent particular actors into San Francisco. Did you address the entire tort rule in Liu? Did you mention it? It was not mentioned in Liu, but again, it's a jurisdictional case, and the discussion revolved around – and in the act of state doctrine discussion – revolved around Taiwan's involvement and responsibility for the acts. Counsel, if we look at A-5, it refers specifically to the foreign state or any official or employee of that foreign state while acting within the scope of his office or employment. How do you add agents to that? Do the agents have to be officials or employees, or we just simply get to add the word agents? That seems like a third category besides the state and its officials or employees working within the scope of their employment. Well, Your Honor, we do allege involvement by particular Qatari officials. But not officials in Vermont. The officials – that's right. We allege that in the United States, the actions are the actions of agents who are hired by Qatar. Qatar is responsible for the entire scheme because it – Right, but how do you fit that into A-5? Let me pull up my copy of A-5. Caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment. Does the employee acting within the scope of his employment include, then, any contractor that they hire to do something? Well, that's certainly how it's been interpreted. And I don't believe in this case it's been argued by Qatar that there's a problem with our allegations regarding who did what. I understand your argument is that the reference to foreign state would include agents as this has been construed. But what's the significance of that for purposes of the application of the entire tort rule? If it has to be a tort by the foreign state and the agent isn't listed separately, but – Well, there's – I mean, there is attribution to the foreign state of the conduct within the United States, I remember. But if it has to be the tort of the foreign state and not the agent directly, it has to be the tort of the foreign state, although through an agent, does it mean that for purposes of the entire tort rule that the liability of the foreign state has to be for conduct in the United States? And here isn't the conduct of Qatar that makes it liable for its agent's conduct that occurred overseas? Well, I – again, it's – I mean, this is similar – this is similar to Taiwan. And Taiwan – and I recognize we're not talking about the entire tort rule in there, but we are talking about attribution. And the conduct of the assassins was attributed to Taiwan in that case. And so what we are saying is that the agent's conduct in the United States is attributable to Qatar in the United States. And Qatar had – I'm sorry, Judge Bybee, excuse me. How far would the rule extend? So if Qatar decides to have a party at the embassy and hires a caterer, signs a nice contract with them, and on the way to the party the caterer runs a red light and injures somebody, is Qatar liable for the actions of the agent? Well, I think this is a different case because Qatar is directing the actions. I mean, if Qatar told them to run the red light, then I think – then the action would be attributable. But – so we're talking about, with respect to intentional torts, that Qatar has been part of a conspiracy and directed the action of its agents. I mean, Qatar – From overseas. Well, in part from overseas, presumably. But we've alleged that the conspiracy was actually entered into in the United States. I mean, all of this – all of this has been planned from the Qatari embassy in the United States. The meetings that occurred there, the meetings that involved Nicholas Muzin, who used to be a plaintiff in this case but was dismissed, and we've refiled against him in D.C. But all of that took place in the United States. The identifying of Elliot Broidy as a problem that had to be dealt with and the decisions to target Elliot Broidy, we've alleged, occurred as a result of those meetings in the United States. Now, was there Qatari involvement, you know, from the top? Well, we don't really know, and I don't think you can presume, you know, who did what in Qatar when what we have alleged is this conspiracy was formed and planned from the Qatari embassy with Qatari foreign agents from the United States. So all of that ties to the United States. And what plaintiffs – I'm sorry, what the defendants have contended here is that because of one allegation in the complaint, paragraph 115 of the complaint, which alleges that on two instances on February 14th and February 19th, there were accesses from overseas, from Doha. We have identified that. They have said because of that, well, the entire tort must have taken place in the United States. And first of all, that's not a fair – the notion that this Vermont evidence is somehow inconsistent with that, as the district court held, is not a fair and full account of our allegations. In paragraph, I believe, 181 of the complaint, we specifically allege that there were tortious acts that took place entirely within the United States. Now, the district court said that that was conclusory, but – excuse me – but the whole point of the affidavit in this case, or the declaration in this case, was to provide detail on that fact. And what that has alleged is that we've alleged generally that there were thousands of instances of access, two identified from Qatar. Most of them were covered – cloaked through VPN access, as we say in paragraph 114 of the complaint. And in addition – but in addition to the two in Qatar, right around the same time, February 14th from Doha, February 12th, and a couple – and the days that followed from Vermont, there were instances of access from wholly within the United States. Now, those – that tortious act takes place in the United States, and that's what Olson – that's the sense that Olson differs from the other courts that have looked at this entire tort rule. It doesn't require every aspect of the tortious conduct to have occurred in the United States. What it requires is a tortious act in the United States. Can you address the discretionary function issue? Sure. Get my notes on it so I make sure I cover the whole thing. The – our view is that the discretionary function exception to the exception doesn't apply here because hacking a private citizen is not at the core of any governmental function that's protected by the discretionary exception because it's a serious violation of U.S. criminal law. And the exception is modeled, as you know, after the FTCA, and the goal of this exception is to place foreign countries in the same position as the U.S. itself would be. And what – We suggest in RISC and LIU that the relevant inquiry is on whether the foreign states' law prohibits the actions and not whether U.S. law does. In LIU, that was the focus of the inquiry, but RISC came along and treated LIU as one subset of the inquiry. It said LIU doesn't apply because foreign law doesn't make the conduct there unlawful, but RISC goes on to say there are instances where U.S. law binds the discretion of a foreign actor. And it looked at a number of cases, including the D.C. District Court's decision in LaTellier, which involved assassination in the United States. And the court there said that, well, obviously that's the sort of violation of law that binds the discretion. We're not going to say that. That's because LaTellier said that, you know, it's the sort of thing that's not acceptable anywhere. Right, and theft, as my colleague, Mr. Auguste, says, theft is in the Ten Commandments. I mean, that's exactly. Is there any country whose domestic law prohibits its government from engaging in foreign espionage? Is there any country? Well, of course not. But this is, now, Judge Collins, step back for a moment. This is much more than espionage. This is attacking a private citizen and destroying him in the media by using stolen materials. This is much more than state-to-state espionage. All you have to do is look at the Attorney General's statement yesterday. The Attorney General announced the indictment of four Chinese hackers that were involved in the Equifax hacks. And this concern about reciprocity, you know, doesn't the United States do this? Well, the Attorney General answered that. No, we don't. The United States, like other nations, has gathered intel throughout its history to ensure that national security and foreign policy determinations have access to timely information, says the Attorney General. But we collect info only for legitimate national security purposes. We do not indiscriminately violate the privacy of ordinary citizens. That's what this is. This is something much different, Judge Collins. I want to save the rest of your time for Republicans. Okay, thank you. Thanks for reminding me. I've lost the clock. Thank you, Judge Collins. Your Honors, may it please the Court. To prevail on this appeal, plaintiffs need to run the gauntlet of a number of requirements to have access to the exception to immunity at Section 1605A5. In picking up where we just left off with the discretionary function exception, I'd like to make a couple of points about the nature of that exception and why we submit that it bars plaintiffs' claims in addition to a number of other failures to meet the requirements of the exception. And really there's two main points that I want to make about the discretionary function exception. The first, which is what this Court said in Olson and Holy See, the discretionary function exception is essentially Congress' way of implementing this distinction between public and private acts. What is discretionary for a foreign sovereign are things that go to policy, things that are essentially governmental acts. Olson used the phrase fundamentally governmental. So the basic question is, are these allegations of cyber espionage, which concerned a foreign sovereign's response to a foreign policy crisis, attempts to influence the policy of another sovereign, and to use the tools of what Mr. Brody has variously called electronic warfare, information operations, espionage. Is that a governmental act or is that a private act? And we submit that it's quite clear that this is the sort of thing that governments do in their governmental capacity. It's not like an embassy staff member driving through the street and driving negligently on the streets of Washington, D.C. The second point I'd like to make is that this idea that a foreign sovereign lacks discretion to break the law of another state, that Qatari discretion is somehow limited by what United States law says. Now, what this Court indicated in both Lew and Risk, as Judge Collins alluded to, is it's about internal law. In Lew, quite obviously the assassination that happened in California violated the domestic law. This Court didn't say anything about that. It talked about how the ROC courts, the Taiwanese courts, had said this was a rogue, unauthorized act and it violates our laws, the internal laws of Taiwan. And when you think about what Mr. Brody is essentially saying, this idea that State A lacks even discretion, lacks the discretion to do something that violates the laws of State B, that's entirely inconsistent with basic notions of sovereignty. To go back to what this Court has said about the discretionary function exception as about considerations of policy, that's a policy choice, and it may have implications when one state makes the policy choice to do something that puts it and its officials in violation of the law of another state. There could be international sanctions. There could be diplomatic protests. Risk and the District Court opinion in Mattelier acknowledged that there's some limitations on discretion even if it's not a target state. Sure. I think this case doesn't call for the Court to decide what are the outer bounds of that. Of course, Mattelier was talking about assassination. They used the phrase contrary to the precepts of humanity. Assassination is prohibited everywhere. It's a basic matter of both international law and the domestic law of states. In general, when a state commits an assassination of a private citizen, you don't see states taking credit for that or suggesting that's illegal. Espionage is quite different. There's a famous quote from the 1970s. There's a CIA lawyer testifying before Congress, and he said, espionage is nothing but the violation of someone else's laws. Inherently, when a state conducts espionage, exfiltrates data, whether it's from a public official or from a private citizen who is of interest to the foreign sovereign, this is, unlike assassination, something that states do and that states acknowledge that they do. The United States government has said, we engage in cyber espionage. That does not per se violate international law when we do it. And so I think, you know, what the boundaries are on that, you know, the Latelier example, assassination. You know, that raises interesting questions, but those are not questions that this court needs to address today in order to decide this case. The plaintiff seems to be maybe suggesting that there's a distinction here because he is more of a private citizen. He's not a public official. Is there anything to that? No, Your Honor. I don't think so. I think historically, you know, espionage is that, you know, there are private citizens who may have access to information that's of interest to a foreign sovereign. It is something that sovereigns do. You know, that can raise all sorts of diplomatic issues. It can lead to prosecutions. But, you know, the idea that I think you suggested that there is sort of an international norm or law or practice that prohibits cyber espionage when a private citizen is involved, and there's really no support for that whatsoever. So, again, this is something that can lead to prosecutions. It can lead to policy consequences. But, you know, just to step back and think about, you know, what we're dealing with here, you know, these types of acts by a foreign sovereign, the basic question, as this court put it in Olson, is this fundamentally governmental? Does this go to policy concerns? Or, by contrast, is it a private act on the order of negligent driving through the streets of Washington, D.C.? And, you know, this distinction between private citizens, public officials, as alleged, again, you know, the state of Qatar has denied these allegations, but as alleged in this complaint, the allegation is that plaintiffs in this case were viewed as sort of paramount threats to the success of a foreign policy campaign and initiative. And what the allegation is, you know, this is about international sanctions and a diplomatic embargo, you know, a foreign policy crisis of the highest order. The allegation is, you know, plaintiff inserted himself, you know, into this dispute was influencing the government of the United States, was a threat to the national security, essentially, of this foreign sovereign, and the sovereign took these actions that included cyber espionage, targeting this individual. Again, the point is not to suggest that this is a true version of the events, but this is what plaintiffs allege. And in this circumstance, to say that this alleged conduct is not governmental, it's private, it falls on the private side of this distinction. You know, that's not what discretion means. I think when you step back and think about, you know, in terms of reciprocity, which many courts have said is relevant to interpreting this exception and, you know, what it would mean, essentially what it means to say a foreign sovereign lacks discretion, lacks the freedom to make the policy choice to take action in violation of another state's laws, or to limit it to when a target is a private citizen. The United States engages, or at least is reported to engage in drone strikes in Pakistan, where private citizens are certainly targeted, and most likely that's a violation of Pakistani law, and that raises all sorts of policy questions about is that good policy, you know, what should the limits on that be. But I don't think anyone would say that, you know, because it violates Pakistani law, or, you know, because private citizens are affected, that that is not a discretionary choice of the U.S. government when it makes that type of decision. Can you address the entire tort rule? I mean, as I construe the record, they essentially proffered allegations that some of the hacking took place in Vermont and that some of the handoff of information was done within the United States by e-mails or by actual hand transfers. Why don't those constitute entire torts within the United States? Sure. And if I could just take those two separately and begin with these allegations, the sort of late-breaking allegations of a few, I think it's 178 out of hundreds of thousands, intrusions that were allegedly originating from Vermont. And I think it's important to focus on, you know, what the procedural posture of those particular allegations is. That is not in the complaint. The complaint, you know, only identifies Qatar as a source of the hack in general. They did ask in their opposition to your motion for leave to amend and indicated that they would carry those allegations over. So given the liberality of leave to amend. Your Honor, I agree that that is the question for the court. It is not, you know, did the complaint adequately allege an entire tort based on these Vermont allegations because it's not in the complaint. The question is, you know, was it an abuse of discretion by the district court to deny leave to amend? And what this court has said, yes, you know, leave to amend is liberally granted. But one thing the district court has discretion to do is to deny leave to amend when doing so is inconsistent with the theory that the plaintiffs have advanced before. And I think it's important to be clear about what the district court had before it when it made that discretionary decision. This is not a matter of, you know, there was a sort of an ill-considered offhand statement in one complaint that in a subsequent complaint the plaintiff tried to walk back from. First of all, this was a second attempt at an amendment. And more importantly than that, the district court had a long record of a TRO proceeding. This was quite an aggressive litigation strategy where the district court saw plaintiffs come in with evidence, with declarations, with briefs, with experts, and repeatedly say that this was something that happened in Qatar. So just to take one example to highlight, because I think it's not mentioned in the briefs, but it's. It's a little hard to read, but he seemed to. Seemed to think that. Had to allege that all of the conduct occurred in Qatar and that therefore it would be. Plain to now say that part of it took place in the U.S. Was he just. No, Your Honor, I think the district court was saying two things. One, you know, there's there's this decision by Judge Wardlaw when she was on the district court in the Greenpeace case that construes Olson and has, you know, explains this idea of of a continuing tort that transcends, sort of begins in one place, you know, carries into the United States and continues somewhere else. That was one ground for the district court's decision. But the district court also and independently. Sorry. Greenpeace for since you. OK. I mean, this isn't like the continuous carriage of a body that's been. Right. Continuing toward Greenpeace. Wardlaw distinguished the individual acts of battery as those were entire torts with. Isn't this each intrusion more like the individual batteries in Greenpeace? I wouldn't say that, you know, that that's it's not central. I think there's a number of reasons why why we win. And certainly the facts are a bit different from Greenpeace. But, you know, this court has has before it. How do you interpret the entire tort rule and how do you apply it in a case like this where, you know, throughout the case, plaintiffs have not pled. You know, we have a thousand causes of actions based on, you know, a thousand discrete torts. This was this has always been about, you know, the attack, one attack and the idea that, you know, 178 out of hundreds of thousands intrusions happen. In order to have the tort, it must be that all of the conduct that underlies that single cause of action in the complaint has to have occurred in the U.S. It can't be that there's one instance that's an entire tort in the U.S. Your Honor, you know, that that's, you know, in our view, that's the best reading of both the complaint and the entire tort rule. But I don't I don't want to belabor the point because I do think. Consistent with Olson. I mean, because Olson, there were multiple ways of the way the plane was flying around. There were multiple ways you could have said that was a negligent act. That was a negative act. They picked the one that occurred entirely. The U.S. said that was enough. Right now, I think in Olson, the basic idea was, you know, you could present a case through an events trial case to the judge where the plane just starts in U.S. airspace. We don't have to say anything about how it got there. You just look at a plane that's in U.S. airspace and say, was there negligence? Was there negligent pilot piloting? There was. You know, that's enough. You can prove your case based just on that. I don't think reading this complaint, there's really a way to say we could do that. We could just zero in on one hundred seventy eight intrusions from Vermont without the initial spear phishing, which is not alleged to have emanated from anywhere in the United States. And that whole story. What about the dissemination based torts? Right. And I think, again, and this connects a bit back to where where we started this morning with Judge Collins question about the agents. And a point I wanted to make about that that relates to the dissemination. There's a lot of group pleading and sort of vague assertions about, you know, And, you know, the point about dissemination, you know, there's these statements and plaintiff's brief that says, yes, we allege instances of dissemination within the United States. And then you track it back to the complaint and it's entirely conclusory boilerplate. Or, for example, what the plaintiffs say in their brief, you know, go to go to paragraphs one twenty one to twenty five of the complaint. And we allege that the U.S. based agents curated packets of email and then distributed. Well, when you go to paragraphs one twenty one to twenty five of the complaint, really what it is is is a series of allegations about the Washington Post printed this. The Associated Press printed that and thrown in there is one sort of vague allegation that, you know, after these publications happened, Mr. Muzzin knew something about it. But but again, I think when you actually focus on the allegations of the complaint, there's really no there there, even in terms of of the dissemination. I see my my time is up. So unless there's further questions, we'd submit that for for a series of reasons, plaintiffs do not come in with the exception of Section eight five. Thank you. Thank you. Your Honor, about the procedural posture, it's not in the complaint, but we did ask to amend and the court denied it because and abused its discretion because it concluded that that our theory that we were adopting was inconsistent with the theory that all this happened in Qatar. Our theory was never that all this happened in Qatar. In paragraph one eighty one of the complaint, we explicitly allege on information, a belief that some instances of unlawful access and theft occurred completely within the United States. Now, that doesn't have the facts, but but it is our theory. And we fill in the facts with the allegations, which is, as you say, is a proffer. We were simply saying this is what we are prepared to allege. So this is about that. This is about the abuse of discretion on the amendment. And and we we contend that we should have been allowed to amend. You agree that in order to have a chance at satisfying the entire tort rule, you need those allegations. Not on this, not on distribution, on on the on the allegations of the hacking. We think Vermont. We have argued, Your Honor. We have argued that there is a reading of the entire tort rule that would say you focus on California. But but but our principal argument is Vermont on on the hacking. But on the distribution, we have alleged specific facts. We've alleged in the complaint in one sixty four and one twenty nine, I think, in two different locations, that there were entire torts that occurred within the United States. If I can continue this, finish this thought. We've alleged that there were entire torts within the United States. We allege facts that support that. We allege the involvement of a U.S. based company, G.R.A., that that oversaw the hacking. And we allege this date standpoint. This is important. The date standpoint is that someone used and we allege this specifically. Someone used an email program to download the hacked emails from Brody. Using Brody's credentials every time they went in. Sorry. Every time they went in, they had to use the credentials. So every instances of hacking was a different intrusion into different accounts and different different hard drives. But but the the we've alleged this timestamp point, the timestamp point is very important because the timestamps were different than the Pacific timestamp, where the documents, had they been printed by Elliott Brody, would have shown Pacific timestamp. These were central and eastern time. Chancellor, you're over time, but I do have one further question that I do want to ask you. We're in risk. Can you point me to where in risk? It tells me that I should look at domestic law in judging whether or not the discretionary function exception applies. Because I don't see it. There's a reference to there's no violation of Norwegian law. Right. Discussion of the teller and the action that is clearly contrary to the precepts of humanity. And then there's a statement that although these acts may constitute a crime under California law, it cannot be said that every conceivably fact is outside the scope of the discretionary function of substance. Well, that that statement in and of itself assumes that some acts are within the discretionary statement function. But having said that, the site at the end of that to MacArthur. MacArthur is a case that involved violations of zoning ordinances in D.C. in building an embassy. MacArthur has a footnote that says, well, first, we don't think these are criminal violations, but if they are criminal violations, they're not serious enough. And what what MacArthur had said was, we think we think MacArthur read the teller to say that acts that are Malam and say, are serious enough to to to allow liability to to say that they're nondiscretionary. And and again, this is the Ten Commandments rule. These acts. I mean, this isn't just Judge Breast. This isn't just espionage. This is stealing documents that contain confidential information and destroying an American citizen in the media by by leaking them to the media. And that those acts of theft are are serious crimes. Thank you. Thank you. I just argued to be. Thank you very much.
judges: Bybee, Collins, Bress